Good morning, Your Honors. May it please the Court, Peter Keith on behalf of Arthur Gerrans and James Crowley, I'd like to reserve four minutes for rebuttal. So, Your Honor, there's two points I'd like to cover this morning, two legal errors by the District Court. The first has to do with how the District Court evaluated the testimony of witness Christina Martin with respect to George Varela telling her immediately after the murder that Joaquin Siria was the killer. The second is the District Court's error in not applying substantive due process standards to evaluating the recorded interview of George Varela. So, starting with Ms. Martin. So, a plaintiff making a claim under Devereux has to show that evidence was intentionally fabricated by the government. There's undisputed evidence in the record that immediately after the killing, Mr. Varela named Mr. Siria as the killer. This is exactly what plaintiff contends is the fabrication. If this was a fabrication, it was by Mr. Varela, not by the government. The District Court's error here was a classic error under Matsushita in the sense that we had undisputed testimony in the record from Christina Martin. We had a recorded statement she gave to the police in 1990 where Ms. Martin said one or two days after the murder, George told me, this is George Varela, that he was giving Joaquin a ride somewhere. Joaquin got out of the car and shot the man that was supposed to have killed his friend. And then Ms. Martin came for a deposition in 2023. She remembered having a conversation with the police. The foundation was laid and it's undisputed that that 1990 statement is admissible as a recorded recollection. Ms. Martin was repeatedly asked in deposition, did you tell police the truth in 1990? She said yes again and again. She also testified that Mr. Varela was abusive toward her. After that, she was asked, were you truthful with police in 1990? She said yes. Your Honor, it was errors under Matsushita for the District Court to have concluded that a jury could conclude that the opposite. Let me ask you this. So you're up here on an interlocutory appeal, right? Correct. Sounds like what you're talking about, your argument there as you just started off, is you're asking us to second guess the District Court's factual determinations? No, Your Honor. We don't have jurisdiction to do that. So, Your Honor, let me explain why the court— The only thing your argument has to be based on is taking the evidence in the light most favorable to the plaintiff. Your Honor, we agree. But that doesn't mean this Court doesn't have jurisdiction to evaluate the District Court's error here. And I'd like to point— But what error? You're saying, I understood you'd just be saying a factual error. No, Your Honor. You can't do that. Your Honor, the error is in determining what a rational jury could conclude from the evidence in the record. And if I could point the Court to its decision, which was cited and discussed in our brief, the decision in Wilkinson v. Torres, the 2010 decision by this Court where the Court addressed, did it have jurisdiction to engage in this analysis on this qualified immunity appeal? And one of the issues that the Court addressed in that appeal was very close to the issue here. This is a police shooting case. There were two volleys fired. And the officer, the shooting officer, said the decedent continued to move before I fired the second volley. He testified to that repeatedly. But the District Court denied summary judgment because there was an offhand statement once about— and then he stopped along those lines. That phrase was used. This discussion is in the Wilkinson case at page 553. And the Court said, look, all we have here is a testimony of the officer who repeatedly testified that the decedent continued to move before he filed the second volley of shots. It violates Matsushita and Scott v. Harris for the District Court to conclude, based on this stray statement by the witness that's contradicted by everything else the witness said, that the decedent was moving. The Court said it had jurisdiction to make that determination. This is unlike other cases where the Court has found a lack of jurisdiction, in that, you know, I look at the cases cited in my colleague's brief, three of those four cases were police shooting cases, where there was one witness who said, well, the decedent, you know, or the person who was shot engaged in this action. And there was actually conflicting evidence in the form of someone else's testimony, saying, well, the witness didn't do that, or a ballistics report. So there was competing evidence to reconcile. That's why jurisdiction was lacking in those cases. Here, we have the single—we have the testimony of a single witness, of a single witness, and a question, what inferences can properly be drawn from that under Matsushita? So you want us to say that the District Court drew the wrong inference? It drew the wrong conclusion about what a jury could conclude. That sure sounds like a factual question. Well, Your Honor, in Wilkinson, this— I don't—you know, that's just my—that's just my reaction to your argument. I was not expecting that particular argument. Could I ask you to—if you want to have something to say to Judge Davis. No, I think I've explained Wilkinson, Your Honor. If you—could I ask you to turn to the officer's conduct in the interrogation of Mr. Varela, which I take to be the core of the plaintiff's claim here. What is your understanding of the law as of 1990, regarding what it was permissible for officers to do when interrogating somebody like Mr. Varela? As of 1990, the only legal prohibition on interviewing a witness was engaging in physical violence or threats of violence. Under the Florida—I mean, that was established in Florida v. Heisler— I'm sorry, Heisler v. Florida. And then even this Court in subsequent decisions— and again, there's lots of cases cited in our brief, and one of the—I want to call the Court's attention to one in particular. That's the Stute decision, Stute v. City of Everett. Now, Stute involved an interrogation of a developmentally delayed 14-year-old boy. And he didn't understand Miranda warnings, didn't understand his right to an attorney, talked about how the officers just kept drilling him, rejecting his denials, promised him if he confessed he wouldn't be charged, he would get counseling, and so on. And then after about two hours of this, you know, constant badgering, the boy finally confessed. Now, the Court said this is a Fifth Amendment violation. But the Court—but as of the 14th Amendment claim, the Court said this conduct doesn't violate the 14th Amendment. And this Court referred back to the Supreme Court's 2003 decision in Chavez v. Martinez, where the Supreme Court said what violates— what could violate the 14th Amendment in a police interrogation is torture or its close equivalents. And that's the standard that this Court applied in Stute, even in 2009, 19 years after the conduct at issue in this case. And this Court said, basically, Chavez tells us what it takes to violate the 14th Amendment in an interrogation is torture or its equivalent, and that standard isn't met here. So that standard couldn't be met in 2009 in an interview of a developmentally delayed minor. It can't—you know, it couldn't be met by the relatively tame tactics the inspectors used in 1990. I want to point the Court to a couple of other cases. That wasn't a fabrication case, though, was it? It wasn't a fabrication case, Your Honor. But in fabrication cases, the inquiry is, did the police use tactics that were so coercive or abusive that they knew or should have known that they were yielding false testimony? And so we should look to cases to say what tactics, when interviewing a witness, are considered coercive or abusive. Why isn't that a question? I'm sorry. You don't think that it's abusive to make up facts? Well, Your Honor, that's — I mean, that's permitted under Supreme Court law. Under self-incrimination law, officers can make up facts. Oh, I understand that. Yeah. Right. I mean, again, we're talking about what violates the Fourteenth Amendment, what's so coercive or abusive that we essentially charge these inspectors with saying, you knew you were getting false testimony out of a witness. I mean, that's — it has to be that severe, and it's a Fourteenth Amendment right. It's not a Fifth Amendment right, and the standard is a Fourteenth Amendment standard. And so we ask, what's beyond the pale when you're interviewing a witness? And I want to point the Court to a couple of other cases with respect to interviews of accomplices. There's a case that we cite in our brief. It's a district court case, but it comes — it's from 2021. It's the — let me find the case, Your Honors. It's the Garcia case, Garcia v. Burton. This is a case where there was an interview of an accomplice where similar statements were made that were made to Mr. Varela in the sense that you have your whole life ahead of you, you don't want to throw it away for this guy, so forth, to somebody who had information about who knew who had committed a homicide. And the police made those types of statements to this person. You're trying to keep yourself distanced, but you can't. You know, he pulled you into this, and now you need to get yourself out of it. And the Court said those comments don't rise to the level of legal coercion, and this is even in 2021. And so, Your Honors, if the standard here is what was clearly established in 1990 as to what officers could and could not do in interviewing a witness, we have judges saying even in 2021, you can make these types of statements to somebody who is an accomplice in a murder investigation. And so, from that standpoint, there's no case we can point to and say, you know, here's a case that told Inspector Crowley and Inspector Garens that you can't explain, you know, the law of murder to an accomplice who's sitting in front of you and who you know is at the scene and is lying to you about being at the scene. There's no case that says that. There's no case that says, you know, you've been in trouble as a juvenile. You know, you don't want to be in trouble now. There's no case that says you can't curse in an interview with an adult. And so, there's no authority here, Your Honor, to tell these inspectors that they can't do these things they were doing in 1990. And again, the treatment here, again, if we compare it to the Devereaux line of cases, Devereaux, Cunningham, Gaussvik, even Gantt, the conduct here comes nowhere close to those cases. In all those cases but Gantt, the court found no violation. And again, these are cases involving manipulative interviews of minors. And in the Devereaux case itself, we had minors saying the day after they were interviewed, you know, the detective pressured me into it, you know, and I lied. And yet, there was still no liability in those cases. The Devereaux standard is a high standard, Your Honors. And again, we need to look to the state of the law as of 1990 to say what cases told the inspectors they couldn't do the things they did in Mr. Varela's interview. And there's no factual dispute about what happened in the interview. It's recorded. You know, and again, that makes this case unlike Gantt, where there was a dispute about what happened during the interview. And so, Gaussvik says, we look at the interview and we make— and it's a legal ruling that the court makes. It's a legal ruling what a reasonable police officer should have known they could do and could not do at the time of the interview. You're down to just over two minutes now. I'll reserve my time. Thank you.  Mr. Harris. Good morning, Your Honors. George Harris, Norton Law Firm, on behalf of the plaintiff and appellee, Joaquin Siria. Addressing the fabrication claim, the legal standards here are clearly established by the Devereaux case, this court's en banc decision in that case, and also by the Gantt case. Devereaux established that witness— fabrication based on witness coercion can be shown by evidence the defendant used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information. And Gantt defined what shock the conscience of 14th Amendment requirement means in exactly this context, and that is when actual deliberation is possible and when we have this fabrication at issue. And there is deliberate indifference to a reckless disregard of the accused's rights, and it defined—and this is in the context of jury instructions and what a jury should find or could find— deliberate indifference is something more than negligence, but also something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm— Go ahead. So, I mean, setting aside for a moment the fact that both of the cases you just cited were decided some years after this took place, the Supreme Court has told us that we're not supposed to define clearly established law at a high level of generality. And so I think we all agree, it is clear from Devereaux that you can't use, or the officers can't use, coercive or abusive techniques that will yield false information. But what cases would have alerted an officer in 1990 that the particular techniques they used here fell within that rule? Well, you know, I think Devereaux actually addressed the qualified immunity issue and, you know, what was clearly established. I mean, Devereaux itself involved a 1994 investigation, and it there found the proposition virtually self-evident that it was established constitutional due process right not to be subjected to criminal charges on the basis of falsely fabricated evidence, and it cited a 1942 Supreme Court case, Pyle v. Kansas. Right, but Pyle is about knowing presentation of perjured testimony at trial, isn't it? It's not, I mean, I read the, it's a short opinion. There is no description of what the interrogation techniques were in that opinion, is there? No, but this court, I'm talking Devereaux. So nothing in Pyle would tell an officer what kind of questions he can ask when he's interviewing a witness, would it? Well, they were sufficient, the precedent is sufficient that an officer knew that they couldn't do what is prohibited by the Devereaux standard, which is to engage in interrogation so coercive and abusive that it's likely to yield false information. I mean, as this court held, the Devereaux is a virtually self-evident process, and we have... Let me ask you, I mean, I imagine that a lot of the people that the police interview are in some sort of trouble, I mean, potentially an accomplice, right, as in this case. And my understanding is it's fairly common for the police to alert the people that they're talking to to the fact that they're facing some sort of potential liability and say, you know, you better be straight with us because you might be in trouble. Is that unconstitutional? Yes, I mean, that may be common, but that's not... I'm sorry, were you answering yes to the question, is that unconstitutional? Not unconstitutional, no, to say, tell the truth, to say that you might be subject to charges, but that's not all that happened here, and it's not what made the conduct such that a reasonable jury could find that it meets the fabrication standard. What the officers did here was not to say, you know, tell us the truth. It was to say you can be charged with murder as an adult, not if you don't tell the truth, but if you do not implicate this suspect, if you don't say that Joaquin Siria was the shooter, and they combined it with an implicit promise. They said you've got your choice here. You can be a witness, no charges against you, or you can't, if you name Mr. Siria, or you can be charged with murder as an adult. You know, this said to a teenager with a juvenile record who's in police headquarters, believes that he can't leave unless he's allowed to do so, no Miranda warnings. So, I mean, but the issue here is did the district court correctly find that there's sufficient evidence that there's a reasonable jury could find that the standard is met for fabrication? And so you mentioned Pyle. Is there another case that you think would have told the officers that that questioning technique? Oh, you know, we have Tingles, the 1981 Ninth Circuit case. And again, I mean, this is a self-incrimination case, a confession case, but it says confession must not be extracted by any sorts of threats or violence nor obtained by any direct or implied promise. However slight, nor by any exertion of any improper influence. And, you know, the suggestion has been made that, oh, the self-incrimination standard is somehow higher than that for fabrication of evidence. But the issue is newer should have known would yield false information. And I think it's inherently takes less, you know, for a suspect to name somebody else as the person responsible than to incriminate themselves. And clear on this whole line of cases, and this is what Devereux pointed to when it found it virtually self-evident, that you can't engage in something that rises to this level of fabrication. I think it is self-evident that you can't coerce somebody into giving false testimony or a false statement, I suppose. But what I'm suggesting might not be self-evident is, you know, what kinds of questioning techniques fall within that legal rule such that you're not allowed to do them. And in Ryan, which was in the 70s, I think, we said that there was an informant and the government told him that, you know, he could go to jail for 10 years if he didn't cooperate. And we said that we didn't really approve of that, but we said it was not a due process violation. So can you address that? Yeah. Well, the Ryan case held that this said this is a factually intensive issue. This is what the district court held. We're going to look at it on a clearly erroneous basis, and clearly this is disturbing conduct. But, you know, the district court held this here, so we're going to uphold it on a clearly erroneous basis. And, you know, in those cases, we're talking about outrageous government conduct, you know, but we're not addressing the fabrication issue here, again, which is, you know, knowing or should have known would result in false information. And, you know, the Gantt case, and, you know, this is also like a 1994 investigation, what this is looking at, it looked at a very closely analogous situation. We had somebody who was there at the scene of the murder, was a suspect, in the same way that George Varela was a suspect. And was also had been awake for two days, had used crack, and was apparently still under the influence of crack at the time, right? As disputed by the witnesses, the officers in the case. And, by the way, he wasn't in custody because he was being interrogated with regard to the crime. He was there on a separate robbery offense, and they came back to him a couple times to talk to him. But in some ways, the evidence in this case is stronger for the fabrication standard than it was in the Gantt case. Because there, they said, you can be charged with murder if you don't give us information. Tell us what happened. Tell us the truth. That's not what the officers did here. They said, you can be charged with murder unless you tell us what we believe happened. And we're going to give you, as the district court, you know, concluded on finding the fabrication standard was matter, a reasonable jury could so find, that that's not what the officers did. They told him exactly what he needed to do in order to avoid any kind of charges. And what they would accept as the truth. So, you know, a reasonable jury could fully conclude that, you know, the standard was met here. You know, as the district court. Can I just ask you a question to help make sure that I understand your theory of your case? Yes. Which is, as I understand it, you're not, this whole claim does not mean to focus on one particular tactic that the police used. Is that correct? I mean, like, for example, there was a reference here that, earlier discussion about Martinez, the Supreme Court case, what's it called? Chavez versus Martinez. Where the cops, after a shooting, went into the hospital room where the victim was on, you know, he was just about, he was out of it, he was completely out of it. And they went in there and they tried to conduct an interrogation of him, which was outrageous. And that was the basis of the claim in that case. As I understand your case, it's you're looking at what happened over a period of time in that interview room and the cop's desire or method of putting words into his mouth, what they wanted to hear, and that that results in the fabrication of evidence, as we sort of explained in Devereaux. And that determination is a factual determination for the jury on the constitutional claim. Is that right? Exactly. And I would say, I mean, the evidence that supports the district court's ruling conclusion that a reasonable jury could find that the fabrication standard was met here is not just the interrogation itself. I mean, there's evidence that goes to the new or should have known and that goes to the deliberate indifference and reckless disregard. I mean, there's evidence on which a reasonable jury could conclude that at the time of this interrogation, at the time that they got the arrest warrant a day later, a jury can conclude there was no probative evidence of Syria's guilt before threatening Varela with a murder charge if he did not name Syria as the shooter. There was no forensic evidence tying Mr. Syria to the crime. There were attempts at eyewitness identifications, which had failed as admitted by the witnesses in their deposition testimony. There was a failure to investigate discrepancies in the clothing of the suspect and the clothing of Mr. Syria right at the time that night of the murder. They knew that there were alibi witnesses which, you know, they had not interviewed. And by the way, when they did, they disregarded what they said and even threatened one of the witnesses that they interviewed, you know. Counsel, I don't want to use up all your time and I don't want to interrupt you, but I am.  This case is a little confusing. Your position is not that what the conduct in isolation of what the police did or said was wrong. It was that in the context they should, did or should have known that what they were trying to get out of the witness was false. Is that right? Yes, exactly. And that's why the relevant evidence is the surrounding circumstances, what they knew with regard to the investigation. And, you know, defendants rely on, we made, you know, all these other interviews. You know, but the district court concluded as factual finding that what those other interviews amounted to was rumor and gossip. None of those witnesses were witnesses to the murder. Only one of them even testified at trial. And so, again, that's a factual finding by the district court that I think goes to the circumstances. Well, I would assume that the question of whether or not they could or should have known, did or should have known it was false, could be, is what the jury would find and that we have to look at it in the light most favorable to you, right? Exactly. That's correct, Your Honor. I see my time is up. Thank you. So, Your Honors, I want to address this notion that the court or the jury can engage in a review of the police investigation. Devereaux says that it can't. Devereaux is very clear. Police get latitude to believe or disbelieve witnesses. They can weigh evidence. The focus, the inquiry has to be, as this Court said in Gauss v. Perez, whether to survive summary judgment, this is at page 817 of Gauss v. Perez, the plaintiff has to show that the defendant used investigative techniques that were so coercive and abusive that he knew or should have known that those techniques would yield false information. The focus is on the interview. I want to also talk about the Tingle case. The Tingle case, as we distinguished in our brief, was a 1982 case that gave sort of a broad pronouncement about using threats or promises in a self-incrimination interrogation. This Court in Leon Guerrero said Tingle doesn't state the standard correctly. Leon Guerrero was decided in the late 80s. The Supreme Court in Arizona v. Fulminante in 1991 said that that same language doesn't set the standard. So that didn't give the inspectors notice of what they could or could not do in 1990. I want to also talk about the Tobias case. The Tobias case was a case where, again, involved an interview of a 13-year-old child and where the police engaged in bullying techniques, promises, and so forth. And the Court said, well, if we look at our past 14th Amendment decisions, they all involved police engaging in these techniques for four, five, six, seven hours at a time. Here it only happened for two hours. Therefore, qualified immunity applies. And I think this goes to Your Honor's question about kind of looking at the totality and the combination of tactics used in the interview. The thing about qualified immunity is when we have a totality of the circumstances legal test, then it's really difficult to say the law is clearly established, because you need a case that's like this one and has the same combination of circumstances where the police or where the Court says you can't do this here. Well, the classic situation is a case where you're trying to get a confession. Right. Which this wasn't, but yes. Right. This wasn't. This was trying to get him to implicate somebody else. Well, it was trying to get him to tell the truth, Your Honor. That's, I mean, again, I think there were some statements made about how the police tried to feed him a story and say they could only be walking in Syria.  That seems to me is the ultimate issue in the case, is whether or not they should have known that what they were asking him to say was false. Well, Your Honor, again, Devereaux says— That's not really before us. No, because Devereaux says we don't look at, we essentially don't re-litigate the investigation. Your Honors, if we have any, I'm happy to take any further questions. It appears there are not. Thank you. Thank you very much. We thank both counsel for their arguments. The case is submitted.
judges: SCHROEDER, PAEZ, MILLER